IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ex rel. Kevin K. T. Trim acting in the ) <br> capacity as Personal Representative of ) <br> the Estate of M. Theresa Semtner, ) <br>   ) <br>              Plaintiff ) <br>   ) <br> vs.    ) <br>   ) <br> J.D. McKEAN and MEDICAL ) <br> CONSULTANTS, d/b/a Emergency ) <br> Physicians Billings Services, Inc., ) <br>   ) <br>              Defendants ) | No. CIV-94-617-C |

## MEMORANDUM OPINION

This case was heard by the Court, sitting without a jury, beginning on July 23, 1998. Relator K.T. Trim appeared through counsel Mark London, Robert Vogel, and Cheryl Vaught; the government appeared through Laurie Oberembt and Lee Schmidt (Relator and the United States will hereafter be referred to as plaintiff); and defendants appeared through Todd Taylor, Jimmy Goodman, and Rustin Strubhar. During the trial, and with no objection from any party, the Court bifurcated the issues of liability and damages. Counsel have now submitted closing briefs and revised proposed findings of fact and conclusions of law.

This action alleges a right to recover under the <u>qui tam</u> provisions of the False Claims Act (FCA), 31 U.S.C. § 3729-3733, specifically § 3729(a)(1) and (2):

> (a) **Liability for Certain Acts.** -- Any person who--
>
> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> \*\*\*
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustained because of the act of that person . . . .

The Court has earlier permitted the substitution of K.T. Trim, Personal Representative of the Estate of the original Relator, upon the death of M. Teresa Semtner. The United States timely intervened and has added common law claims for unjust enrichment and payment under mistake of fact. Defendants filed a waiver of summons on July 27, 1995, and all defendants except Emergency Physicians Billing Services, Inc. (EPBS) and J.D. McKean, M.D., have been dismissed through compromise and settlement.

## Findings of Fact

Physicians claiming a right to payment from Medicaid or Medicare must comply with the requirements established by Health Care Financing Authority (HCFA). Claims procedures for emergency physicians' services changed dramatically in 1992. Physicians'

claims are submitted by codes, which are based on criteria established by the American Medical Association in the Physicians' Current Procedural Terminology (CPT). Prior to 1992, these codes were based on visits, from minimal to comprehensive, and distinguished between new and established patients. Beginning in 1992, the CPT established new codes for emergency medicine, known as evaluation and management services (E/M). The new codes defined five levels of services - 99281-99285 - usually referred to as Levels 1 (lowest) through 5 (highest).

To be reimbursed under the 1992 CPT, an emergency physician must document performance of certain work in three areas: history, examination, and medical decision-making. These components are further broken down as follows:

    a. <u>History</u>

For the history component, the four levels are:

● Problem Focused -- chief complaint; brief history of present illness or problem.

● Expanded Problem Focused - chief complaint; brief history of present illness; problem pertinent system review.

● Detailed -- chief complaint; extended history of present illness; extended system review; pertinent past, family and/or social history.

● Comprehensive -- chief complaint; extended history of present illness; complete system review; complete past, family and social history.

b. <u>Examination</u>

For the examination component, the four levels are:

• Problem Focused -- an examination that is limited to the affected body area or organ system.

• Expanded Problem Focused -- an examination of the affected body area or organ system and other symptomatic or related organ systems.

• Detailed -- an extended examination of the affected body area(s) and other symptomatic or related organ system(s).

• Comprehensive -- a complete single system specialty examination or a complete multi-system examination.

c. <u>Medical-decision-making</u>

To determine the level of complexity of medical-decision-making, one must take into account the following three elements: (1) number of diagnoses or management options, (2) amount and/or complexity of data to be reviewed, and (3) risk of complications and/or morbidity or mortality. Based on these three elements, the medical decision-making can be classified as:

• Straightforward;

• Low Complexity;

• Moderate Complexity; or

• High Complexity.

Since 1992, for E/M services rendered in the emergency department, CPT has required that all three of the key components meet or exceed the following thresholds to qualify for the stated level of service:

- 99281:   History: problem focused
           Examination: problem focused
           Medical-decision-making: straightforward

- 99282:   History: expanded problem focused
           Examination: expanded problem focused
           Medical-decision-making: low complexity

- 99283    History: expanded problem focused
           Examination: expanded problem focused
           Medical-decision-making: moderate complexity

- 99284    History: detailed
           Examination: detailed
           Medical-decision-making: moderate·complexity

- 99285:   History: comprehensive
           Examination: comprehensive
           Medical-decision-making: high complexity

During the year 1992 only, the level of medical-decision-making necessary to qualify for 99283 was "low to moderate complexity." This changed to "moderate complexity" in 1993 and thereafter.

All of these components were new in 1992. No clinical examples were provided as had been done with the earlier visit codes until 1993, and more precise definitions have evolved each year since 1992. There is virtually no dispute that coding emergency physicians' services is a subjective endeavor, although as the components and their subparts have undergone further refinement and definition with each annual CPT Manual since 1992, E/M coding is more predictable and less subjective.

J.D. McKean, M.D., directed the Emergency Medicine Department at Midwest City Hospital in Midwest City, Oklahoma, during the early 1980's. In 1982, the rules for physician reimbursement by government medical programs changed so that hospitals could no longer include claims for physicians. Responding to the need for emergency physicians' billing services, Dr. McKean established EPBS, originally to bill and collect for Midwest City Hospital physicians but eventually growing to bill millions of dollars in claims for physicians nationwide. EPBS provides coding, billing, and collections services by contract with its clients, primarily emergency physician groups, and is itself paid based on a percentage of revenues either billed or recovered, depending on the client. Dr. McKean is the Chairman and CEO of EPBS, and a family trust owns the remainder of the stock.

Dr. McKean has served in leadership positions in organizations of and relating to emergency physicians. He is knowledgeable regarding CPT codes and billing practices, as well as insurance and governmental requirements. EPBS has received compliments, as well as criticism, regarding the accuracy and fairness of its coding. EPBS competes aggressively in a nationwide market.

EPBS employs 120-130 coders, recruited from nurses, emergency medical technicians, and others with experience in the medical profession. It has billed for over 100 emergency departments in as many as 33 states. Generally, emergency physicians' groups using EPBS complete charts on each patient seen in the emergency department, gather them on a daily basis, and ship them to the EPBS office in Oklahoma City. Rather than working

on all departments coded by EPBS, the coders are assigned to particular emergency departments so as to achieve familiarity both with the doctors and the department and their peculiarities. The system relies on the honesty and good faith of both physicians and coders, as the reimbursement code is assigned based on the services noted in the chart.

EPBS coders receive a base pay with bonuses. Forty charts per hour were required of all coders during most of the period in question although rising to a high of 50 and set now at 32 per hour. A competitor of EPBS, touting itself as the "gold standard of coding" requires 120 per day. EPBS's requirement of 40 charts per hour means the average time spent coding each chart was 90 seconds. New coders went through a training period of several weeks, first going through charts with experienced coders responsible for their training, then coding on their own by affixing Post-It Notes reviewed by the trainer, and finally coding on their own. Their quota was reduced during training. No coder at EPBS ever attended training or any other informational meeting regarding emergency department coding other than in-house EPBS training. No coder ever contacted a physician with questions regarding a chart.

Financial incentives have been offered to Dr. McKean's employees clearly connected to cooperation in this lawsuit and, although unstated, common sense and historical precedent lead to the implication that further incentives will follow if the suit is won. This, combined with the number of changes in the testimony of his current employees between

their depositions and trial and the inherent improbability of their testimony, causes the Court to give little, if any, weight or credit to their testimony on disputed issues.

The philosophy and practice of EPBS, until notified of this lawsuit, has been to code based on the "service rendered" without regard to what was documented. This was the testimony of virtually every current or former EPBS employee, although none explained satisfactorily how they could tell what service was rendered if it was not reflected on the chart. Clearly Dr. McKean did not feel his billing was constricted by the information provided by the doctors he served. For example, Dr. McKean's letter to a concerned client offered the choice of (1) coding based on CPT and documentation provided or (2) based on the service provided without regard to documentation, and estimated the first option would reduce income by 20-40% (plaintiff's exhibit 112). Dr. McKean made statements at a videotaped training session: "Historically, in this company, we've given the emergency physician the benefit of the doubt and have coded the level of service while we've tried to get them to give us the documentation to support that level of service;" "There's two sides to this equation - the service and the documentation. Most of the doc[tor]s are providing the service. The documentation is purely a red tape crap issue;" "The real issue for us is are we coding the level of service provided and the level of service documented? Today the answer to that is no." (Defendants' exhibit 115j). Dr. McKean and EPBS employees have consistently espoused the philosophy that charts may and should be coded based on something other than what is shown on the chart.

Although the evidence was in dispute regarding presumptive coding, the Court finds the greater weight of the credible evidence, as well as common sense, requires a finding that coders used short-cuts or presumptive coding. These short-cuts varied from coder to coder, but they were taught during and after the initial training, shared between coders, and their use was known, taught, and encouraged by supervisory personnel. Some diagnoses or circumstances which, without more, established the billing code were blunt head trauma, auto accident victim, admission to hospital through emergency room, and anyone arriving by ambulance. The witnesses assigned varying levels of service to these diagnoses/circumstances, but clearly it was the practice to use the diagnosis, or the method of arrival, or hospital admission, rather than the chart. Although the evidence is that these codes were justified in many instances, the coders did not make that independent judgment when using presumptive coding; rather, a coder would observe from a chart that, e.g., the patient was admitted to hospital, and code it at 5 without further analysis. The billing practice described herein was not uniform or consistent, i.e., not all described diagnoses were coded at the same levels, but the evidence is clear that each coder used his or her own set of presumptive codes. Likewise, once examples were provided to help interpret the CPT code, anything reasonably similar to an example would be coded at that level, regardless of the components charted.

EPBS's in-house coding manual in 1994 stated that Level 1 would be appropriate in less than 1% of emergency department visits; Level 2 in less than 5%. Although this

conclusion was not supported by any historical data and was not reflected in national billing information provided by other coding services, the Level 1 and 2 codes assigned by EPBS employees did not exceed these figures. Additionally, the Court concludes from the greater weight of the evidence that Levels 1 and 2 were discouraged and in some instances required permission before being assigned. The evidence does not support defendant's contention that its emergency departments treated higher acuity patients which would provide justification for the more frequent use of higher codes. Nation- and program-wide statistics show that EPBS billed at levels consistently higher than the average during 1992-1995, used Levels 1 and 2 markedly less and Level 5 more than other billers.

In addition to the E/M code, a diagnosis code (ICD-9) is assigned to each chart. While the E/M code is assigned separately and on different criteria than the ICD-9 code, in some cases it makes a difference in reimbursement. EPBS employees were instructed not to use certain ICD-9 codes, e.g., psychiatric diagnoses for Medicare patients in Michigan, because reimbursement would be reduced or eliminated.

The CPT manual was never available to any EPBS coder. Instead, Dr. McKean wrote his own confidential coding manual, devoted entirely to emergency department coding. In 1993, when the medical-decision-making necessary to justify a Level 3 changed from "low to moderate" to "moderate," the manual was not changed, and the greater weight of the credible evidence is that no coder was aware of the change. Thus, many claims for

Level 3 reimbursement submitted after 1993 were false, although there is insufficient evidence to calculate how many.

In 1992 and 1993, EPBS coders used a -52 modifier for Levels 3-5 to notify its physicians the documentation was insufficient to support the level of service actually assigned by the coder. In other words, a code followed by -52 would mean that a Level 3, 4, or 5 was billed but the chart lacked a component necessary for that level of service. For Level 3, the -52 modifier reduced the charge to that of a Level 2; for Level 4 and 5 codes, however, the -52 modifier was kept internally but not transmitted to the payor so that payment was based on levels of service not consistent with CPT requirements. There is nothing in any version of the CPT code to support this billing practice; Dr. McKean had no justification for its use, and it was clearly a designation that the chart did not support the level of service claimed. The Court concludes all codes 99284-52 and 99285-52 in 1992 and 1993 were false claims.

An audit of Oregon Medicare billing in 1992 resulted in an instruction to EPBS that the code indicating services were provided after hours or on Sundays or holidays was inappropriate for emergency department billing. EPBS's philosophy was that it would include any and all services permitted by CPT, regardless of the entitlement to reimbursement, even if the payor instructed to the contrary. The evidence is not entirely clear whether the after hours/Sunday/holiday code was available after the new CPT became

mandatory, but any use of this code in a claim made for Medicare reimbursement in Oregon after June 17, 1992, constitutes a false claim.

Many of the witnesses testified regarding their understanding of the so-called "educational window," i.e., a period during which all affected could be trained on the new procedures. Dr. McKean and others at EPBS generally attempt to excuse any nonconforming billing practice by invoking this "educational window." Clearly HCFA understood that the change in codes would require some time and training before the desired consistency would be achieved. However, no document or verbal communication, either directly or by implication, excuses a good faith attempt to comply with the new E/M codes. The Court finds it abundantly clear, from the testimony, writings, and videotaped presentations of Dr. McKean, that his intent was to get what he could by fair means or foul, and if caught to shift blame to the confusion created by the new CPT codes.

After this suit was commenced, audits were performed on EPBS billing practices for the following payors: Xact administered Medicare (Pennsylvania), Medicaid in Oregon and Arizona, CHAMPUS, and Mailhandlers Federal Employees Health Benefits Programs.

The Oregon audit was performed in response to a letter explaining this lawsuit and urging the identification of false claims to be included in the damage recovery. The audit was begun by one employee of the Oregon Medical Assistance Program but amended and finalized by Judith Anderson who testified at trial. Her experience has primarily been with

hospital coding (other than emergency departments) as opposed to physician reimbursement.

The Pennsylvania audit was performed by Dr. Robert Shesser, a board certified emergency physician and professor and chairman of emergency medicine at George Washington University. Dr. Shesser had been the emergency medical advisor to Xact, the Medicare carrier in Pennsylvania for many years, but had done only sporadic chart reviews until this audit. Dr. Shesser doesn't do a great deal of emergency coding, but has coded in the past and has vast experience and knowledge of emergency department procedures and requirements. The Pennsylvania audit contained far more handwritten charts than any other, and the documentation provided by these physicians was generally abysmal. The Court notes that many of these charts are completely illegible and, in some cases, don't appear to be written in English.

The persons responsible for the audits of Arizona Medicaid, CHAMPUS, and Mailhandlers FEHB did not testify.

The Court finds these audits to be insufficient to constitute a statistical sample of the universe of fraudulent claims. The Oregon audit was tainted by the request, which invited a recovery in a pending action if fraudulent claims were found, and the Pennsylvania charts were not typical of any other program. Without any testimony as to the reliability of the auditor or circumstances under which the audit was undertaken in the remaining three, the Court is unwilling to extrapolate those findings to all other claims. Moreover, in light of

the admittedly subjective nature of coding, the relatively small sample size, and the variation in years covered, given the evolution of more consistent and predictable coding definitions and practices over time, the audits are not a reliable or accurate representation of <u>all</u> EPBS claims.

Although the audits will not be used to find a percentage of false claims from <u>all</u> claims submitted by EPBS, certainly the audits contain persuasive evidence of false claims. The documentation which supports the audits, combined with the multitude of improper billing practices summarized above, requires the conclusion that inflated codes found in the audited charts represent false claims. Because the invitation to share in the proceeds of this lawsuit taints the objectiveness of the plaintiff's audit in Oregon, only those claims where two of defendants' three experts agree the code was too high will be deemed false. In the other audits, however, if any one of defendants' experts agree with the plaintiff's audit that a claim is too high, it will be deemed false. Using the summaries provided in defendants' exhibits 427, 429, 431, 433, and 435, the Court concludes there are ten false claims in the Oregon Medicaid audit; 48 from the Arizona AHCCS audit; 95 from the Medicare audit; 65 from the CHAMPUS audit; and 56 from the Mailhandlers audit.

## Conclusions of Law

This Court has jurisdiction under 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1331 and 1345.

False Claims Act

In order to establish a violation of the FCA, a plaintiff must show by a preponderance of the evidence that: (1) a false or fraudulent claim (2) is presented to the United States for payment or approval (3) with knowledge that the claim is false or fraudulent. 31 U.S.C. § 3729(a)(1). Alternatively, a plaintiff may prove the FCA claim by showing: (1) a false record or statement (2) is used to cause the United States to pay or approve a fraudulent claim (3) with the defendant's knowledge of the falsity of the record or statement. 31 U.S.C. § 3729(a)(2). Further, where a corporate officer has knowledge of the falsity of a claim, that knowledge is imputed to his employer - the corporation itself. See United States v. Entin, 750 F.Supp. 512, 519 (S.D. Fla. 1990).

Each false claim results in a statutory penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages sustained by the government, absent leniency for certain cooperation which may reduce the penalty to an amount not less than two times the amount of damages sustained by the government. 31 U.S.C. § 3729(a). Additionally, in a qui tam action, a defendant is also liable for reasonable costs and legal fees incurred by the qui tam plaintiff. 31 U.S.C. § 3730(d).

A "claim" includes any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, which is either directly remitted by the United States government, or if the government will reimburse the contractor for any portion of the money or property requested or demanded. 31 U.S.C. § 3729(c). In deciding

whether a given statement is a false claim or demand for payment, a court must determine if, within the payment scheme, the statement has the purposeful effect of inducing wrongful payment. United States v. Rivera, 55 F.3d 703, 709-10 (1st Cir. 1995). Where it is alleged that a defendant has made multiple false claims, the court must focus on the specific conduct of the defendant. United States v. Krizek, 111 F.3d 934, 939 (D.C. Cir. 1997). If a defendant separately files multiple claims for payment or reimbursement, the court may impose a separate penalty for each claim. United States v. Woodbury, 359 F.2d 370, 378 (9th Cir. 1966).[1] The gravamen of a false claim focuses on the conduct of the defendant, and inquiries into the defendant's purpose and intention in filing the requests for payment or reimbursement. Krizek, at 939.

Violations of laws, rules, or regulations alone do not create a cause of action under the FCA. United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir. 1996), cert. denied, ___ U.S. ___, 117 S.Ct. 958 (1997). A defendant must have the requisite knowledge to violate the statute. Under the FCA, "knowing" and "knowingly" means that a defendant, at the time of filing the claim, (1) has actual knowledge of the information's false nature; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). Importantly, no proof of specific intent to defraud is required. Id. The heart of the FCA claim is a fraudulent misrepresentation. Hopper, at 1267. However, a violation of a

---

[1] While Woodbury considered an earlier version of the False Claims Act, the definition of a "claim" is applicable here. See also United States v. Bornstein, 423 U.S. 303, 307 (1976).

regulatory provision, in the absence of a knowingly false or misleading representation, does not amount to fraud. Id. For a statement to be knowingly false, it must be more than merely an innocent mistake or misinterpretation of a regulatory requirement. Id.

If a plaintiff successfully establishes all elements of a FCA claim, the court must consider the issue of damages. Under the FCA, damages must also be proven by a preponderance of the evidence. 31 U.S.C. § 3731(c). In a recent case, the Tenth Circuit Court of Appeals declined to directly address whether proof of damage was a necessary element under a different subsection of the FCA; however, in describing the elements under the provision at issue here, damages was not listed as a necessary prerequisite to relief. United States ex rel. Aakhus v. Dyncorp, Inc., 136 F.3d 676, 681, 682 (10th Cir. 1998). Several jurisdictions have previously held that actual damages are not a necessary element of the FCA claim. See, e.g., Rex Trailer Co. v. United States, 350 U.S. 148, 153 & n. 5 (1956); In re Schimmels, 85 F.3d 416 (9th Cir. 1996); United States v. Rivera, 55 F.3d at 709; United States ex rel. Pogue v. American Healthcorp, Inc., 914 F.Supp. 1507 (M.D. Tenn. 1996); United States v. Kensington Hosp., 760 F.Supp. 1120 (E.D. Pa. 1991). It is clear that the focus of the inquiry, in a claim under the FCA, is to the claim and the conduct of the claimant, rather than its effect on the government, and the Court finds proof of damage as a result of the claim is not a necessary element.

The Court concludes that these legal principles, when applied to the facts found here, result in a right to relief on some, but not all, of plaintiff's FCA claims. The submission of

the following claims was violative of the FCA: Level 3 claims after 1993[2]; claims for levels 4 and 5 followed by "-52" during 1992 and 1993; Oregon claims including Sunday/holiday/after hours codes after June 17, 1992; and the inflated claims found in the five audits prepared in connection with this lawsuit. The Court finds that these claims were (1) false, (2) presented to the United States for payment; and (3) made with knowledge of their falsity or, in some cases, in reckless disregard of their falsity. J.D. McKean and EPBS are jointly and severally liable for these false claims, the number of which shall be determined at the damages hearing. Calculations based on these findings should be undertaken by counsel and presented at the second stage hearing.

Alternative Theories of Relief

Plaintiff has made alternative claims for damages for payment under mistake of fact and unjust enrichment. In a false claim payment dispute, the government is entitled to reimbursement for payments made in reliance on the contract where it is shown: (1) payments were made (2) under belief that they were properly owed; (3) that belief being erroneously formed; and (4) the mistaken belief was material to the decision to pay. See United States v. Mead, 426 F.2d 118, 124 (9th Cir. 1970). The party to which the mistaken payments flowed is liable to the government for each of the mistaken overpayments. Id. Only the portion of the payment that was in excess of the actual amount owed must be

---

[2] Although there does not appear to be a way to calculate the number of false claims of this description short of examining and recoding every Level 3 claim submitted, the Court will leave this question open until the damages hearing.

returned. Id. The doctrine of unjust enrichment applies to situations were there is no legal contract, but where the person sought to be charged is in possession of funds which in good conscience and justice should not be retained, but should be delivered to the rightful owner. Matarese v. Moore-McCormack Lines, 158 F.2d 631, 634 (2nd Cir. 1946). Where this is true, the courts impose a duty to refund the money to the party to whom it should belong. Id. Absent proof on the damage issue, resolution of either claim is premature. Moreover, it appears the theories are mutually exclusive and that either one is mooted by the Court's findings under the FCA; however, as neither side has briefed these issues, the Court will defer any ruling on the alternative theories of recovery.

## Conclusion

In accordance with the foregoing, the Court finds plaintiff is entitled to recover under the FCA for the false claims described above. This matter will be set for further hearing on damages and penalties. The Court will conduct a scheduling conference by telephone with all counsel, and will set the matter for further settlement conference before a final damages hearing.

IT IS SO ORDERED this 20 day of November, 1998.

ROBIN J. CAUTHRON
UNITED STATES DISTRICT JUDGE

ENTERED IN JUDGEMENT DOCKET ON 11-20-98

semtner opn wpd